# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

THOMAS SLOANE,              )
                                     )
        Plaintiff,          )
                                     )
v.                                    )
                                   ) Civ. Act. No. 4:16-cv-01571-MWB
GULF INTERSTATE FIELD SERVICES,   )
INC.,                  ) (Judge Matthew W. Brann)
                                   )
        Defendant.     )
                                     )
_____)

---

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

Annette A. Idalski, Esquire
Admitted *pro hac vice*
Peter N. Hall, Esquire
Admitted *pro hac vice*
**Chamberlain Hrdlicka White
  Williams & Aughtry**
191 Peachtree Street, NE, 46th Floor
Atlanta, Georgia 30303
Telephone: (404) 658-5386
Facsimile: (404) 658-5387
annette.idalski@chamberlainlaw.com
peter.hall@chamberlainlaw.com

***Attorneys for Gulf Interstate Field
Services, Inc.***

Veronica Saltz Turner, Esquire
Attorney ID No.: 52931
**Chamberlain Hrdlicka White
  Williams & Aughtry**
300 Conshohocken State Rd., Ste 570
West Conshohocken, PA 19428
Telephone: (610) 772-2330
Facsimile: (610) 772-2305
vsaltz@chamberlainlaw.com

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

PROCEDURAL HISTORY ....................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 3

    I.    The Parties ................................................................................................ 3

          A.   Gulf Interstate Field Services ......................................................... 3

          B.   Thomas Sloane .............................................................................. 4

    II.   Plaintiff's Job Duties as a Welding Inspector .......................................... 4

          A.   Plaintiff Exercised Discretion and Independent Judgment .............. 4

          B.   Plaintiff's Job Duties Did Not Involve Manual Labor ...................... 7

    III.  GIFS Paid Plaintiff a Salary Based on a Guarantee of Seven Days Per Week ...... 9

QUESTIONS PRESENTED ................................................................................... 10

ARGUMENT AND CITATION OF AUTHORITIES ................................................. 11

    I.    SUMMARY JUDGMENT STANDARD .................................................... 11

    II.   PLAINTIFF'S FLSA CLAIMS FAIL BECAUSE HE IS EXEMPT FROM THE OVERTIME REQUIREMENTS ................................................. 11

          A.   The Undisputed Evidence Establishes that Plaintiff Meets the Administrative Exemption ............................................................. 12

          B.   Oil and Gas Pipeline Inspection Is an Exempt Job ....................... 23

          C.   The Undisputed Evidence Establishes that Plaintiff Meets the Highly Compensated Exemption ............................................................ 26

    III.  PLAINTIFF'S PENNSYLVANIA MINIMUM WAGE ACT CLAIM FAILS BECAUSE HE IS EXEMPT FROM THE OVERTIME REQUIREMENTS ............ 28

    IV.  PLAINTIFF'S UNJUST ENRICHMENT CLAIM FAILS BECAUSE IT IS DERIVATIVE OF OVERTIME CLAIMS THAT HAVE FAILED ............... 29

CONCLUSION ...................................................................................................... 30

## TABLE OF AUTHORITIES

Page(s)

Cases

*Acs v. Detroit Edison Co.*,
  444 F.3d 763 (6th Cir. 2006) ............................................................... 16

*Amendola v. Bristol-Myers Squibb Co.*,
  558 F. Supp. 2d 459 (S.D.N.Y. 2008) .................................................. 28

*Ballard v. Dover Wipes Company*,
  No. 13-714-RGA-MPT, 2015 WL 2089089 (D. De. May 4, 2015) ........... 19, 20

*Baum v. AstraZeneca LP*,
  372 F. App'x 246 (3d Cir. 2010) .......................................................... 29

*Brock v. On Shore Quality Control Specialists, Inc.*,
  Civ. Act. No. A-84-CA-603, 1987 WL 31308 (W.D. Tex. Sept. 29, 1987)..... 18, 23, 24, 25

*Castle v. Walling*,
  153 F.2d 923 (5th Cir. 1946) .............................................................. 14

*Coppage v. Bradshaw*,
  665 F. Supp. 2d 1361 (N.D. Ga. 2009) ................................................ 28

*Counts v. South Carolina Elec. & Gas Co.*,
  217 F.3d 453 (4th Cir. 2003) .............................................................. 27

*Darvea v. Detecon, Inc.*,
  515 F.3d 334 (4th Cir. 2008) .......................................................... 26, 27

*Davis v. Mountaire Farms, Inc.*,
  453 F.3d 554 (3d Cir.2006) ................................................................ 12

*EBC, Inc. v. Clark Bldg. Sys., Inc.*,
  618 F.3d 253 (3d Cir. 2010) .............................................................. 29

*Escribano v. Travis County*,
  No. 1:15-cv-331-RP, 2016 WL 8856918 (W.D. Tex. Aug. 25, 2016).............. 27

*Freidrich v. U.S. Comp. Servs., Inc.*,
  833 F. Supp. 470 (E.D. Pa. 1993)......................................................... 15

*Haas v. Verizon New York, Inc.*,
No. 13-CV-8130 RA, 2015 WL 5785023 (S.D.N.Y. September 30, 2015) .................... 19

*Hein v. PNC Financial Services Group, Inc.*,
511 F. Supp. 2d 563 (E.D. Pa. 2007) ............................................................. 12

*Jochim v. Jean Madeline Educ. Ctr. of Cosmetology, Inc.*,
98 F. Supp. 3d 750 (E.D. Pa. 2015) .............................................................. 29

*Juarez v. Autozone Stores, Inc.*,
No. 08cv00417-CAB(BLM), 2012 WL 12846087 (S.D. Cal. Sept. 28, 2012) ................. 30

*Karna v. BP Corp. N.A.*,
No. H-12-0101, 2013 WL 1155485 (S.D. Tex. Mar. 19, 2013) ....................................... 28

*Kennedy v. Commonwealth Edison Co.*,
410 F.3d 365 (7th Cir. 2005) ....................................................................... 14

*Mamola v. Group Mfg. Servs., Inc.*,
No. CV-08-1687-PHX-GMS, 2010 WL 1433491 (D. Ariz. Apr. 9, 2010) ....................... 28

*Marshall v. Western Union Tel. Co.*,
621 F.2d 1246 (3d Cir. 1980) ....................................................................... 26

*McReynolds v. Pocahontas Corp.*,
192 F.2d 301 (4th Cir. 1951) ....................................................................... 16

*Messmer v. Colors in Bloom, Inc.*,
67 F. App'x 719 (3d Cir. 2003) ..................................................................... 29

*O'Dell v. Alyeska Pipeline Service Co.*,
856 F.2d 1452 (9th Cir.1988) ................................................................... 23, 25

*Paul v. UPMC Health Sys.*,
No. 06-1565, 2009 WL 699943 (W.D. Pa. Mar. 10, 2009) ............................................. 29

*Snipes v. Ne. Pharm., Inc.*
No. 2:11-cv-1000-SRW, 2013 WL 757628 (M.D. Ala. Feb. 27, 2013) ........................... 16

*Strunk v. City of Altoona*,
166 Pa. Super. 608 (1950) ........................................................................... 30

*Williams v. Genex Servs., LLC*,
    809 F.3d 103 (4th Cir. 2015) ....................................................................... 26

*Wilson Area Sch. Dist. v. Skepton*,
    860 A.2d 625 (Pa. Cmwlth. 2004), *aff'd* 586 Pa. 513 (2006) ......................... 29

*Wright v. Corning*,
    679 F.3d 101 (3d Cir. 2012) ....................................................................... 12

*Zannikos v. Oil Inspections (U.S.A.), Inc.*,
    605 F. App'x. 349 (5th Cir. 2015) ................................................... 18, 20, 23

## Statutes

Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ............................................ 1

Pennsylvania Minimum Wage Act, 34 Pa. Code § 231, *et seq.* ......................... 1, 3

34 Pa. Code § 231.83 ..................................................................................... 29

## Other Authorities

29 C.F.R. § 504.601(d) ................................................................................... 18

29 C.F.R. § 541.200 ....................................................................................... 12

29 C.F.R. § 541.200(a)(1) ............................................................................... 12

29 C.F.R. § 541.200(a)(2)-(3) .......................................................................... 17

29 C.F.R. § 541.201(a) ................................................................................... 19

29 C.F.R. § 541.202(a) ................................................................................... 22

29 C.F.R. § 541.202(b) ................................................................................... 21

29 C.F.R. § 541.202(c) ................................................................................... 22

29 C.F.R. § 541.601 ................................................................................. 12, 26

29 C.F.R. § 541.601(a) ................................................................................... 27

29 C.F.R. § 541.601(c) ................................................................................... 27

29 C.F.R. § 541.602(a) ............................................................................. 12, 13

29 C.F.R. § 541.604(b) ................................................................................. 13, 16

29 C.F.R. § 541.700(a) ...................................................................................... 17

29 C.F.R. § 541.701 ........................................................................................... 27

Fed. R. Civ. P. 56(a) ......................................................................................... 11

## INTRODUCTION

The issue before this Court is whether Plaintiff Thomas Sloane, a former professional Welding Inspector who earned over $140,000 (annualized) at Gulf Interstate Field Services, Inc. ("GIFS"), is exempt from the overtime requirements of the Fair Labor Standards Act ("FLSA") and the Pennsylvania Minimum Wage Act ("PMWA"). The undisputed evidence shows that Plaintiff meets both the administrative and highly compensated exemptions because he was paid a guaranteed salary, earned in excess of $100,000 (annualized), was not required to perform manual labor, regularly worked with minimal (if any) oversight interpreting welding procedures and testing results, and advised workers on how to repair defective welds. Not only is GIFS entitled to judgment as a matter of law, this frivolous action should never have been filed in the first place.

## PROCEDURAL HISTORY

After listening to repeated radio advertisements seeking to recruit pipeline workers, Plaintiff called the advertising firm (Bruckner Burch PLLC), and thereafter filed his Complaint on September 16, 2015 in the Western District of Pennsylvania. [Doc. No. 1]. GIFS filed a Motion to Dismiss, arguing that Plaintiff was not an adequate class representative given his extensive criminal history. [Doc. No. 6]. Judge Nora Barry Fischer denied that motion because Plaintiff argued that he had "gotten his life back on track" and could be trusted. [Doc. 66] at 14. Judge Fischer later learned, however, that Plaintiff and his counsel had forum-shopped to her court even though Plaintiff never worked in her district and, therefore, transferred the case to this Court on July 29, 2016. [*See* Doc. No. 136] at 8.

Following extensive briefing and oral argument in both this Court and Judge Fischer's court, this Court issued a 67-page opinion denying both motions. [Doc. No. 192].

In the course of examining whether Plaintiff was similarly situated to the putative class, the Court examined both Plaintiff's compensation and job duties. [*Id.*]. Several important observations from that Order are relevant to the instant Motion.

With regard to Plaintiff's salary, the Court rejected Plaintiff's argument that "a promised amount guaranteed for a set period of days was not a salary". [Doc. No. 192] at 47. "Just because a salary is expressed as a guaranteed amount per day does not mean that it is no longer a salary – just the same as expressing it in an hourly, bi-weekly, monthly, or quarterly increments does not convert it from a salary to an 'hourly rate,' 'monthly rate,' or 'quarterly rate.'" [*Id.*] at 47-48. After analyzing Plaintiff's payroll records, the Court noted that he "received the same amount of pay every week [he] worked for GIFS, a disbursement known in common parlance as a fixed salary." [*Id.*] at 50. The Court further noted that Plaintiff was paid his full salary even when he took personal time off, as he did over the Fourth of July holiday in 2014. [*Id.*] at 50-51.

The Court also examined evidence related to Plaintiff's job duties in the context of deciding whether those duties differed amongst potential class members. Nevertheless, the Court recognized several key admissions that are relevant here, including the admission that Plaintiff worked autonomously and without close supervision;[1] that he did not do manual labor except on rare occasions or when he was "bored";[2] and that he gave

---

[1] [Doc. No. 192] at 39 ("[Plaintiff] further admitted that, at times, his supervisor would permit him a great deal of autonomy in precisely how, where, and in what manner he could perform his day-to-day job duties.").

[2] [Doc. No. 192] at 40 ("[Plaintiff] also addressed safety issues that he observed and only periodically assisted with manual work if he got 'bored.'").

2

recommendations to welders on how to fix defective welds.[3] Plaintiff has no evidence that rebuts or changes the testimony and documents that were before the Court at the certification stage. For all of these reasons, and those that follow, and given the overwhelming evidence supporting Plaintiff's exempt status under the FLSA and PMWA, GIFS requests that the Court grant its Motion.

## FACTUAL BACKGROUND

I.   The Parties

   A.   Gulf Interstate Field Services, Inc.

GIFS is a staffing business that places different types of inspectors, including Welding Inspectors, on projects for oil and gas transportation companies that construct and maintain pipeline systems. (DSUMF ¶ 1). GIFS' inspectors work for clients on different kinds of projects, including pipelines, compressor stations, pump stations, meter stations, terminals, and pipeline integrity projects. (DSUMF ¶ 2). The inspector's role is to inspect the work of other contractors engaged by GIFS' clients to construct the pipelines and other facilities. (DSUMF ¶ 3). The exact work performed by an inspector depends in part on the type of project to which he is assigned. (DSUMF ¶ 4). For example, a welding inspector on a pipeline construction project examines a single pipeline as sections of the pipe are welded together. (DSUMF ¶ 5). But a welding inspector on a compressor station (like Plaintiff) examines different kinds of welds on different components of the station, including pumps, cooling towers, turbines and other rotating equipment. (DSUMF ¶ 6).

---

[3] [Id.] ("[W]hen a weld failed to pass [Plaintiff's] inspection, the welders 'would ask [him his] personal opinion on what [he] would do as a welder to fix that, and [he] might offer [his] opinion.") (alterations in original).

B.      Thomas Sloane

In addition to his college education, Plaintiff had three years of experience as a professional Welding Inspector before working for GIFS. (DSUMF ¶ 7). GIFS hired Plaintiff as a Welding Inspector in April 2014 and sent him to Wyalusing, PA to work on a compressor station refurbishment project ("Station 319") for Kinder Morgan. (DSUMF ¶ 8). He was paid a six figure salary - $140,500 annualized. (DSUMF ¶ 9). In addition to Sloane, GIFS sent seven other inspectors to Wyalusing, including Chief Inspector Jack Groves, who coordinated GIFS' inspection efforts and oversaw the other seven inspectors, including Plaintiff. (DSUMF ¶ 11-12).[4]

II.    Plaintiff's Job Duties as a Welding Inspector

A.      Plaintiff Exercised Judgment and Independent Discretion

Welding Inspectors are "responsible for overseeing Welder qualifications, welding work, welding facilities, welding conditions, weld records and radiographic examinations." (DSUMF ¶ 15). In doing so, a Welding Inspector "exercises independent judgment and discretion in making recommendations to the Client's Project Manager regarding the quality standards, safety practices and regulatory compliance aspects of pipeline construction projects." (DSUMF ¶ 16). Examples of the primary job responsibilities of a Welding Inspector are set forth in GIFS' job description, and include:

- "Consult[ing] with the construction contractor's foreman and radiographers regarding information on matters concerning welding and radiographic examinations."

---

[4] Plaintiff worked as a Welding Inspector for GIFS for just six months, with all but the last month spent on the Station 319 project. (DSUMF ¶ 13). When the Station 319 project ended, Plaintiff was assigned to another Kinder Morgan project in Oklahoma for just one month (the "Paden Loop" project). (DSUMF ¶ 14).

- "Oversee[ing] that welding and weld inspections are being performed in compliance and mak[ing] recommendations and provid[ing] consultation to Client's Project Manager with respect to applicable welding procedures, guidelines, standards and codes specified in the contract document."

- "Consulting with Client's Project Manager regarding the contractor's welders qualifications in accordance with the specified standards/procedures and [ensuring] their names are listed on the qualified welders list."

- "Establish[ing] that the contractor's welders and radiographers are using the proper designation when identifying the welds, radiographic film and drawing numbers on their daily reports."

- "Establish[ing] that the construction contractor maintains weld maps and as-built drawings."

- "Coordinat[ing] and administer[ing] the transfer of radiographic film and reports from the construction contractor to the third party NDE auditor."

- "Oversee[ing] that the required documents are properly completed and forwarded to the Chief Inspector and Client's Project Manager on radiography, final weld acceptance certifications, and welder qualification test reports."

- "Visually inspect[ing] welds, read[ing] X-rays to determine if the weld is proper and making recommendations and consulting with Client's Project Manager, including recommendations with regard to weather."

(DSUMF ¶ 17).

As Mr. Groves explained, testing welders and applying weld procedures is not a mechanical exercise; it requires significant discretion and judgment. (DSUMF ¶ 21). Specifically, Mr. Groves testified:

> While there are written weld procedures that welders must follow, the procedures allow the welding inspector discretion in deciding whether certain parts of the procedure have been performed in a satisfactory manner. In fact, Kinder Morgan's weld procedures expressly state that the welding inspector can require more restrictive practices than those set forth in the weld procedure. [*See e.g.*, Kinder Morgan Welding Procedure Specification, Plaintiff 005038, attached as Exhibit I]. For example, this particular weld procedure provides that preheating can be done either by propane burner or "other method approved by the welding inspector." In circumstances like these, it is up to the welding inspector to take into account conditions in the field, as well as his experience and judgment, to decide whether the method used by the welder is satisfactory or not.

(DSUMF ¶¶ 22, 24).   Inspecting welds requires experience and judgment to interpret and apply weld procedures to actual conditions in the field. (DSUMF ¶¶ 21, 25). It also requires the inspector to use his experience and judgment to decide whether a weld 'looks right' or if it has, for example, too much porosity or undercutting." (DSUMF ¶ 31). Plaintiff agrees that inspecting welds requires the inspector to determine if a weld has too many defects. (*Id.*)

The Welding Inspector must make judgment calls regarding how to handle welds that he deems to be defective. (DSUMF ¶ 32). Specifically, Plaintiff testified that depending on the defect, there are multiple ways to fix a weld. (*Id.*) Of course, Welding Inspectors do not simply reject a weld and then leave the welder guessing as to why it was rejected and how to repair it. Rather, Welding Inspectors have to use their experience and knowledge to determine how to properly fix inadequate welds. (DSUMF ¶ 34). For example, when the welding torch leaves the groove, it is up to the Welding Inspector to decide if it is necessary to cut out the weld (which can be time consuming and costly), or if a less expensive repair can be completed, such as grinding out the weld and re-welding the pipe. (DSUMF ¶ 35).

As Mr. Groves explained:

> Plaintiff "should use his judgment as to when, to whom, and how strongly to make recommendations and suggestions as to how the welders can produce welds that will pass inspection. … It is up to the welding inspector to tailor his recommendations and feedback to the contractor, and to know when issues should be elevated, so that the welding inspector can help maintain a positive working relationship amongst the client, the contractor, and GIFS." (DSUMF ¶ 28).

As the only Welding Inspector on the Station 319 project, Plaintiff was responsible for making sure all of the welding on the project was done properly. (DSUMF ¶ 17). Because welding was going on in several places simultaneously, this meant that Plaintiff had to use his judgment as to where to focus his attention. (DSUMF ¶ 19). As Mr. Groves

stated, "Sometimes, I gave instruction to Mr. Sloane about where he should focus his attention, and other times, he made that decision on his own." (*Id.*).

Plaintiff's own description of his job duties as a Welding Inspector on the Station 319 project lines up with both the Welding Inspector job description and Mr. Groves's testimony about Plaintiff's job duties. Plaintiff's resume, for example, says that he was a "Senior Welding Inspector" and describes his time working for GIFS as follows:

> As a direct representative of [Kinder Morgan], I would ensure all welds and piping was fabricated to welding specs and WPS/code . . . Responsibilities include: Auditing Contractor Weld Documentation. Scheduling, interpreting, and reviewing radiographic film, and other NDT. Welder Testing.

(DSUMF ¶ 20). Plaintiff testified about the job duties he identified in his resume as follows:

- Auditing Contractor Weld Documentation. Plaintiff admits he was responsible for making sure that the welding contractor's records were complete. (DSUMF ¶ 36). If the welders' documentation was lacking in any way, it was up to Plaintiff to determine how to fix the issue. (DSUMF ¶ 37).

- Welder Testing. Plaintiff tested every welder on the Station 319 project before they were allowed to weld, and only those welders that passed Plaintiff's examination were allowed to work on the Station 319 project. (DSUMF ¶ 38).

- Nondesctructive Testing (NDT). Plaintiff interpreted radiographic film and other NDT and agreed or disagreed with the X-ray technician's determination as to whether a weld was defective or not. (DSUMF ¶ 40).

- Ensuring Welds Met Code. Plaintiff was required to interpret welding procedures and client specifications, and apply those requirements to actual conditions in the field. (DSUMF ¶ 21). When a weld failed to pass Plaintiff's inspection, Plaintiff admitted that the welders would ask him for his opinion as to what he would do as a welder to fix it, which he would give. (DSUMF ¶ 39).

Plaintiff performed these inspection activities at Station 319 with little or no direction from the Chief Inspector. (DSUMF ¶ 42).

### B.    Plaintiff's Job Duties Did Not Involve Manual Labor

As explained by Plaintiff's supervisor, being a Welding Inspector on the Station 319

project did not involve manual labor. (DSUMF ¶ 43). Mr. Groves testified:

> To my knowledge as Plaintiff's supervisor, he did not perform any manual labor on the Station 319 project. If I had known Plaintiff was performing manual labor on the Station 319 project, I would have instructed him to stop doing so, as that would not have been part of his job duties. (*Id.*). (DSUMF ¶¶ 18, 43)

Plaintiff admits that it was not part of his job to fix or install anything with his own two hands. (DSUMF ¶ 44). Indeed, on the Paden Vapor Loop project, Plaintiff spent the majority of his time "outside the [pipeline] fence," or in his car doing paperwork. (DSUMF ¶ 45). On the Station 319 project, Plaintiff spent his time looking at welds all day. (*Id.*) Importantly, Plaintiff only inspected the welding, he never did any welding himself. (DSUMF ¶ 46).

Plaintiff testified to just two situations in which he might have used his hands to do work. The first situation was when he may have addressed a safety issue by moving materials around or setting up a barricade around an excavation area, which he did only on an *ad hoc* basis. (DSUMF ¶ 47). The second situation is when Plaintiff may have picked up a wrench or helped bolt something, but he was never asked to do this as part of his job – he only did it when he "got bored standing around too long." (DSUMF ¶ 48).

Plaintiff's job as a welding inspector at a compressor station along a natural gas pipeline was critical to the safe operation of the pipeline for obvious reasons. As Plaintiff testified, "[b]ecause natural gas is flammable and explosive, and you really want to contain it. You want good quality welds; otherwise, there's that possibility of not containing it and having a fire and explosion and environmental damage." (DSUMF ¶ 47). Indeed, without quality welding, a natural gas compressor station can become "dangerous to life, health, and environment." (*Id.*). Additionally, Plaintiff's work in explaining to welders why a defective weld was rejected and to monitor the repair of the defective weld had a significant effect on

the client's operations, because each time he identified a defective weld and required that it be repaired, the client's overall progress on construction is slowed down and additional expense is occurred. (DSUMF ¶ 50). Thus, the welding inspector must strike a balance between not slowing a project down and not allowing poor quality welds. (*Id.*).

### III.   GIFS Paid Plaintiff a Salary Based on a Guarantee of Seven Days Per Week

Plaintiff's compensation was described in a pay letter dated April 11, 2014, which he received at the outset of his employment. (DSUMF ¶ 51).The April pay letter advised Plaintiff that he would be paid a salary of "$386/Calendar Day (as approved by Client)." (DSUMF ¶ 52). Since there are seven calendar days each week, this meant that Plaintiff would be paid a salary of $2,702 per week for the duration of the time that the Client needed a welding inspector on the project. (DSUMF ¶ 54).

In early 2014, GIFS became aware that, notwithstanding its long practice of paying a guaranteed salary, its pay letters were being misinterpreted by the attorneys who eventually became Plaintiff's counsel as providing a "day rate," or a set amount per day that was paid only for days actually worked, and not paid for days not worked. (DSUMF ¶ 55).These same attorneys had filed a lawsuit in Ohio alleging violations of the FLSA based on the "day rate" theory. (DSUMF ¶ 56). Because GIFS' actual practice had always been to pay its inspectors a salary based on a set amount multiplied by a guaranteed number of days per week and to set the record straight, GIFS sought to dispel the "day rate" myth in writing. (DSUMF ¶ 57).

In doing so, GIFS issued Plaintiff and others a second pay letter dated June 17, 2014 that clarified that his compensation was a "fixed salary" of "$386/Day – Guaranteed seven (7) days per week." (DSUMF ¶ 58). Plaintiff's second pay letter states, in part:

You are being hired as a full time oil & gas pipeline inspector. This is an exempt

position, which means you are not entitled to overtime pay. You will be paid your guaranteed salary (stated above) if you are at the job and ready and willing to work. You will not be paid while you are away from the job site for personal reasons... In consideration of your services, you will be paid a salary.

It is [ ] GIFS' policy and practice to accurately compensate employees in compliance with all applicable state and federal laws, including the salary basis requirement of the FLSA. GIFS prohibits all improper deductions from the salaries of exempt employees. (*Id.*).

Consistent with his seven day per week guarantee, Plaintiff received his full salary of $2,702 per week for every week he was employed by GIFS, regardless of whether he was being paid pursuant to the April pay letter or the June pay letter. (DSUMF ¶ 59).

As Plaintiff's supervisor stated, Plaintiff's compensation was the same whether he worked all seven days in a week or not. (DSUMF ¶ 60). For example, Plaintiff testified that during the week of July 4, 2014, he only worked a half day on Friday, July 4, went to New York City that evening to watch the fireworks, and did not return to the job site until Sunday, July 6. (DSUMF ¶ 61). When Plaintiff turned in his timesheet, he wrote that he did not work on July 5 while he was in New York. (DSUMF ¶ 62). Nevertheless, Plaintiff was still paid his full salary that week. (DSUMF ¶ 63).

Additionally, "[t]here were a number of weeks during the Station 319 project when no work was done on a Sunday," which was Plaintiff's regularly-scheduled "day off." (DSUMF ¶¶ 64, 65). However, "because [Plaintiff] [was] guaranteed seven days' pay each week, [he] got paid the full amount of [his] salary even in weeks when [he] did not work on Sunday." (DSUMF ¶ 66). On an annualized basis, Plaintiff's salary of $2,702 per week with GIFS was over $140,500. (DSUMF ¶ 68).

## QUESTIONS PRESENTED

1.      Where Plaintiff was guaranteed to be paid for seven days every week, $386

per day, was Plaintiff paid a guaranteed <u>salary</u> of more than $100,000 per year on an annualized basis? *Suggested Answer: Yes*

2.      Where Plaintiff's job as a Welding Inspector required him to interpret welding procedures in light of actual conditions in the field, visually inspect welds, decide where to allocate his time and attention, decide which welders were qualified, interpret radiographs and other NDT results, and give recommendations as to how defective welds could be repaired, did Plaintiff's primary job duties include exercising discretion and independent judgment with regard to matters of significance in connection with the general business operations of GIFS' customers such that the administrative and/or highly compensated exemptions from overtime apply? *Suggested Answer: Yes*

3.      Where Plaintiff is exempt from overtime and was fully paid by GIFS, is Plaintiff entitled to recovery on an unjust enrichment theory? *Suggested Answer: No.*

## ARGUMENT AND CITATION OF AUTHORITIES

### I.   SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[5]

### II.  PLAINTIFF'S FLSA CLAIMS FAIL BECAUSE HE IS EXEMPT FROM THE OVERTIME REQUIREMENTS

---

[5] *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012).

In FLSA overtime cases, the employer bears the burden of showing an exemption.[6] Summary judgment is appropriate when there is no question that one of the overtime exemptions applies.[7] More than one exemption may apply to a particular employee. In this case, Plaintiff is exempt under both the <u>administrative exemption</u> and the <u>highly-compensated exemption</u>. Each of these exemptions has two primary components: (1) a salary basis component and (2) a job duties component.[8]

A. **The Undisputed Evidence Establishes that Plaintiff Meets the Administrative Exemption**

1. **The Salary Basis Component Is Satisfied**

The salary basis component of the administrative exemption requires that an employee be paid on a salary basis in an amount not less than the regulatory minimum. 29 C.F.R. § 541.200(a)(1). To be paid on a "salary basis" means that the employee "regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a). Salaries can be computed on a daily basis, so long as the employee receives a guarantee of at least the required minimum amount. 29 C.F.R. § 541.604(b).

Plaintiff argues that he was paid a "day rate," and not a guaranteed salary, because his pay letters state that he would receive a salary calculated on an amount per "Calendar

---

[6]   *See Davis v. Mountaire Farms, Inc.*, 453 F.3d 554, 556 (3d Cir.2006).

[7]   *Hein v. PNC Financial Services Group, Inc.*, 511 F. Supp.2d 563, 569 (E.D. Pa. 2007) (granting summary judgment to employer because the employee, a securities broker, was exempt from FLSA overtime requirements under the administrative exemption).

[8]   29 C.F.R. § 541.200 (administrative); § 541.601 (highly compensated).

Day." However, Plaintiff's payroll records, his own testimony, and the declarations of his supervisor destroy Plaintiff's "day rate" theory. The undisputed evidence shows that Plaintiff was paid a predetermined weekly amount, based on a set amount per day times a guaranteed number of days per week, satisfying the salary basis test under the FLSA.

a. The *Hughes* Court Already Ruled that GIFS Paid a Guaranteed Salary

The same "day rate" theory that Plaintiff espouses here was rejected by Judge Sargus in the *Hughes* case.[9] In that case, Plaintiff's counsel argued that there was a factual dispute as to whether GIFS paid a salary because the pay letters at issue in that case said that the inspectors would be paid a certain amount per "day worked." *Hughes*, 2015 WL 4112312, at *3. However, Judge Sargus held that "fatal to the Plaintiffs' argument is the fact that…employment agreements are no longer the relevant starting point for whether an employee is paid on a salary basis." *Id.* at *4. Rather, the question is not "what a plaintiff is owed under his employment agreement, but what compensation [the plaintiff] actually received." *Id.* Finding that the payroll records showed that the plaintiffs were paid on a salary basis, the Court granted summary judgment to GIFS. *Id.*

As in *Hughes*, the indisputable payroll records establish that, except for the first and last weeks, which were prorated under 29 C.F.R. 541.600, Plaintiff was paid the exact same amount ($2,702) every week of his employment. (DSUMF ¶ 59).

b. Plaintiff's Undisputed Payroll Records Establish that He Was Paid a Guaranteed Salary

Here, Plaintiff's payroll records and admissions present an even more compelling

---

[9] *Hughes*, 2015 WL 4112312, at *1; [Doc. No. 192], at 6-7.

case than in *Hughes.* The evidence conclusively proves a guaranteed salary because Plaintiff was paid his full salary even in weeks when Plaintiff did not work all seven days.

First, "[t]here were a number of weeks during the Station 319 project when no work was done on a Sunday", which was Plaintiff's "day off." (DSUMF ¶¶ 64-65). However, "because [Plaintiff] [was] guaranteed seven days' pay each week, [he] got paid the full amount of [his] salary even in weeks when [he] did not work on Sunday." (DSUMF ¶ 66).

Additionally, Plaintiff testified that he only worked a half day on Friday, July 4, went to New York City that evening to watch the fireworks, and did not return to Wyalusing until Sunday, July 6. (DSUMF ¶ 61). When Plaintiff turned in his timesheet, he wrote that he did not work on July 5 while he was in New York. (*Id.*) Nevertheless, Plaintiff was paid his full salary even though he did not work all seven days that week. (DSUMF ¶ 62).

The days during which Plaintiff did not work but nevertheless was paid the same fixed salary are "highly problematic" for his case.[10] If Plaintiff had been paid a day rate (as he claims), then his pay would have been less than his predetermined weekly amount when he had a day off or was on vacation.[11] But as in *Kennedy v. Commonwealth Edison Co.,* Plaintiff's pay was the same, regardless of how many days he worked.[12] (DSUMF ¶ 63).

---

[10] *See* Doc. No. 192, at 50 (citing *Kennedy v. Commonwealth Edison Co.,* 410 F.3d 365, 371 (7th Cir. 2005).

[11] *See Castle v. Walling,* 153 F.2d 923, 924 (5th Cir. 1946) (finding day rate rather than salary when employees "did not receive the 'weekly salary' unless they worked a full workweek of six days, and, for each day's absence from work, they received a deduction of one-sixth of the 'weekly salary'").

[12] 410 F.3d at 371 (holding that power plant supervisors came within the reach of the administrative exemption where "the record indicate[d] that even if an employee had chosen to take the day off without pay, [the employer] would not have reduced her salary").

That Plaintiff was paid his full salary even when he did not work all seven days is proof positive that he was paid a salary rather than a day rate.[13] Accordingly, based on the payroll records, testimony, declarations, and law, there is no dispute that Plaintiff was paid over $140,000 (annualized) on a salary basis.

### c.  Plaintiff's Pay Letters Are Additional Evidence that Plaintiff Was Paid a Guaranteed Salary

An employer is not required to state in writing that it is paying a guaranteed amount.[14] Nonetheless, Plaintiff's pay letters, like his payroll, contain even stronger evidence than those in *Hughes*. For example, while the *Hughes* pay letters said the inspectors would be paid per "day worked," Plaintiff's April 2014 pay letter states that he would be paid per "Calendar Day." (DSUMF ¶ ¶ 51, 52). Of course, calendar days will pass (and Plaintiff would be paid) whether he works or not. (DSUMF ¶ 60). Thus, Plaintiff's April 2014 pay letter is even more indicative of a guarantee than the pay letters in *Hughes*.[15]

Additionally, Plaintiff's June 2014 pay letter expressly stated that he would be paid a <u>guaranteed</u> salary calculated by multiplying a set amount by the seven calendar days in a week: "Fixed Salary: $386/Day – Guaranteed seven (7) days per week". (DSUMF ¶ 58). In

---

[13]  *See Freidrich v. U.S. Comp. Servs., Inc.*, 833 F. Supp. 470, 474 (E.D. Pa. 1993) (finding salary rather than day rate because "[w]hile the number of hours or days [plaintiffs] worked varied from week to week, their pay did not.").

[14]  *Hughes*, 2015 WL 4112312, at *4. ("it is not written descriptors of the payment policies that are relevant to the salary-basis test inquiry, but rather the actual payment practice").

[15]  To the extent Plaintiff relies on the language "as approved by Client" in the April 2014 pay letter, his reliance is misplaced. This language is merely reflective of the fact that GIFS' customer confirmed the time period for which Plaintiff is working on a project. (DSUMF ¶ 53). In its pay letter, GIFS agreed to pay Plaintiff for every "Calendar Day" that fell within the period during which its customer required a Welding Inspector. (DSUMF ¶¶ 53, 54).

other words, the one thing that Plaintiff's counsel argued was missing in *Hughes* – a written guarantee of the salary – is present in Plaintiff's June 2014 pay letter. Indeed, what more could GIFS have done to prove it paid a guaranteed salary? The only conclusion that a reasonable jury could reach on these undisputed facts is that Plaintiff was paid a salary.

Plaintiff's twisted interpretation of his pay letters is not only highly unconvincing, it is downright frivolous. As this Court previously noted, "[j]ust because a salary is expressed as a guaranteed amount per day does not mean that it is no longer a salary." [Doc. No. 192] at 47. Plaintiff's argument puts dispositive weight on the word "day" wherever it appears, but this ignores that an employee can be paid on a daily basis and still meet the salary basis test:

> **An exempt employee's earnings may be computed on …a daily … basis, without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee** of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked, and a reasonable relationship exists between the guaranteed amount and the amount actually earned.

29 C.F.R. § 541.604(b) (emphasis added). Indeed, it has long been recognized that "[a]ny formula which results in … a guarantee is sufficient" to satisfy the salary basis test.[16] For example, in *Snipes v. Ne. Pharm., Inc.*,[17] the court granted summary judgment to a defendant that (1) computed the plaintiff's salary on an hourly basis and (2) paid a guaranteed minimum each week. *Id.* The facts here are identical, except that Plaintiff's salary was computed on a "daily" rather than an "hourly" basis. Both methods are allowed

---

[16] *McReynolds v. Pocahontas Corp.*, 192 F.2d 301, 303 (4th Cir. 1951); *see also Acs v. Detroit Edison Co.*, 444 F.3d 763 (6th Cir. 2006) ("an employer may satisfy the salary-basis test even though it chooses to pay salaried employees on an hourly basis").
[17] No. 2:11-cv-1000-SRW, 2013 WL 757628, at *7 (M.D. Ala. Feb. 27, 2013).

by the FLSA.

Plaintiff's salary, which was calculated by multiplying a set amount per day ($386) by a guaranteed number of days per week (seven), resulted in a fixed weekly amount regardless of the number of days worked, meets the salary-basis test under the FLSA.

### 2. The Job Duties Component of the Administrative Exemption is Satisfied

The undisputed evidence shows that each element of the administrative exemption has been satisfied. In order to qualify under the FLSA's administrative exemption, Plaintiff's (i) primary job duty (ii) must consist of the performance of office or non-manual work (iii) directly related to the management or general business operations of GIFS or its customers (here, Kinder Morgan), and (iv) involve the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a)(1)-(3).

### a. Plaintiff's Primary Duty Involved Non-manual Work

The "primary duty" is "the principal, main, major, or most important duty that the employee performs." 29 C.F.R. § 541.700(a). "Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.*

The regulations define "manual labor" primarily by example – including the type of work done by "carpenters, electricians, mechanics, plumbers, iron workers, craftsmen, operating engineers, longshoremen, construction workers, laborers and other employees

who perform work involving repetitive operations with their hands, physical skill and energy." 29 C.F.R. § 504.601(d) (emphasis added). Thus, to be exempt under this element of the administrative exemptions, Plaintiff's primary duty must have been non-manual, or must not have involved operations with his hands, physical skill, or energy. *Id.*

Plaintiff's primary duties involved testing welders, visually inspecting welds to make sure welding was completed properly, and determining whether and how defects needed to be fixed, but he never performed any welding himself. (DSUMF ¶¶ 16, 17, 26, 46). The Fifth Circuit and the Western District of Texas have both held that visual inspection duties are non-manual.[18] Additionally, in *Schaefer v. Indiana Michigan Power Co.*, the Sixth Circuit held that an environmental specialist was exempt even though he spent at least *some* of his time performing manual tasks outside of the office.[19]

Like the plaintiff in *Schaefer*, Plaintiff may have done some incidental manual tasks, but he was not asked to do this nor was it part of his job – he only did it when he "got bored standing around too long." (DSUMF ¶ 48). Additionally, any "labor" involved in walking around to look at welds was directly related to Plaintiff's inspection duties, and, therefore,

---

[18] *Brock* v. On Shore Quality Control Specialists, Inc., No. A-84-603, 1987 WL 31308, at *7 (W.D. Tex. Sept. 29, 1987) ("there [was] no question that the primary duty of all the inspectors at issue consisted of performance of non-manual work"); *Zannikos*, 605 F. App'x. 349, 354 (concluding that the plaintiffs, who inspected and oversaw line blending, rather than performing the line blending itself, performed non-manual work).

[19] 358 F.3d 394, 402 (6th Cir. 2004) ("[a]lthough Schaefer spends some of this time inspecting trucks, examining load bracings, inspecting shipping containers, and examining shipping labels, these 'inspection' tasks – even if not performed at his desk – are nonetheless not manual tasks. Schaefer performs manual tasks when he actually picks up a hammer to brace a load or installs or tightens a strap.").

was also exempt.[20] Accordingly, even taking the evidence in the light most favorable to Plaintiff, it is clear that he performed non-manual inspection work.[21]

      b. **Plaintiff's Primary Job Duty of Welding Inspection Was Directly Related to the Quality Control Function of GIFS' Customers**

  The administrative exemption also requires that Plaintiff's primary duties directly relate to the management or general business operations of GIFS or GIFS' customers (here, Kinder Morgan). 29 C.F.R. § 541.201(a). "To be directly related to the management or general business operations of the employer means the type of work performed by the employee is 'directly related to assisting with the running and servicing of the business,' as distinguished, for example, from working on a manufacturing production line."[22] "[S]uch work includes, but is not limited to, work in functional areas such as … quality control; … safety and health; personnel management … and similar activities."[23]

  In *Ballard*, the Court held that a plant manager was exempt even though she walked through the plant to observe production and occasionally maintained machines.[24] While the plaintiff may have performed physical labor or maintained machines, she was primarily paid to "use her expertise to make decisions aimed at improving efficiency."[25] Similarly, in

---

[20] *Haas v. Verizon New York, Inc.*, No. 13-CV-8130 RA, 2015 WL 5785023, at *5 (S.D.N.Y. September 30, 2015) ("if inspecting … is exempt work, the physical activity necessary to facilitate [Plaintiff's] inspections would also be exempt").

[21] *Schaefer*, 358 F.3d at 402.

[22] *Ballard v. Dover Wipes Co.*, No. 13-714-RGA-MPT, 2015 WL 2089089, at *5 (D. De. May 4, 2015) (citing *Swartz v. Windstream Communc'ns, Inc.*, 429 F. App'x. 102, 104-105 (3d Cir. 2011)).

[23] *Ballard*, 2015 WL 2089089, at *5 (citing 29 C.F.R. § 541.201(b)).

[24] *Id.* at *6.

[25] *Id.*

*Zannikos*, despite the plaintiffs' claims that their work was "more in line with someone working in a production line," the court held that the plaintiffs' work "primarily included supervision, quality control, and ensuring compliance with applicable standards."[26] In *Pieretti v. Dent Enterprises, Inc.,* the Court found that the employee did work related to general business operations because "his main duties consisted of ensuring that the services the CPs rendered to [his employer's] customers were satisfactory."[27]

Like the plaintiffs in *Ballard*, *Zannikos*, and *Pieretti*, Plaintiff's welding inspection duties directly related to the administration and quality control of Kinder Morgan's business operations. Like the plaintiff in *Ballard*, Plaintiff walked around Station 319 to observe the welding process; he did not do any welding himself. (DSUMF ¶¶ 45-46). Rather, he was paid (handsomely) to use experience and judgment to make sure that the welding that was being done by others was completed properly. (DSUMF ¶¶ 16, 17, 21). Accordingly, Plaintiff's duties were directly related to the "quality control" of GIFS' customer, Kinder Morgan, and therefore satisfy this element of the administrative exemption.

c.   **Plaintiff's Primary Job Duty Included the Exercise of Discretion and Independent Judgment**

The administrative exemption requires "the exercise of discretion and independent judgment with respect to matters of significance, which 'involves the comparison and the evaluation of possible course of conduct and acting or making a decision after the various possibilities have been considered.'"[28] First, GIFS' job description states that Welding

---

[26]  605 F. App'x at 353.

[27]  No. 11-2170, 2013 WL 754436, *3 *(E.D. Pa. Feb. 27, 2013).

[28]   *Zannikos*, 605 F. App'x at 355 (citing 29 C.F.R. § 541.202(a)).

Inspectors "exercise independent judgment and discretion in making recommendations to the Client's Project Manager regarding the quality standards, safety practices and regulatory compliance aspects of pipeline construction projects." (DSUMF ¶ 16).

Moreover, when considering whether Plaintiff exercised discretion and independent judgment, the Court should look at "all the facts involved in the particular employment situation in which the question arises", including:

- Whether Plaintiff had the authority to interpret or implement management policies or operating practices. 29 C.F.R. § 541.202(b).
  - Plaintiff had the authority to interpret and implement the welding procedures required by Kinder Morgan in light of actual conditions in the field such that the goal of high-quality welds was achieved. (DSUMF ¶ 21).

- Whether Plaintiff performed work that affected business operations to a substantial degree, even if Plaintiff's assignments were related to operation of a particular segment (welding) of the business. 29 C.F.R. § 541.202(b).
  - Plaintiff's inspection work had a significant effect on Kinder Morgan's business operations. Each time Plaintiff identified a defective weld and required a repair, or determined that weather prevented effective welding, he slowed down progress, which resulted in more expense. (DSUMF ¶¶ 30, 50). Thus, Plaintiff could impact the overall cost of the project. (*Id.*).[29]

- Whether Plaintiff had authority to waive or deviate from established policies and procedures without prior approval. 29 C.F.R. § 541.202(b).
  - Plaintiff could deviate from welding procedures in light of actual conditions in the field. (DSUMF ¶ 23). When he deemed it appropriate, he could apply more stringent standards than required by the welding procedures. (*Id.*).

- Whether Plaintiff consults or gives advice to management. 29 C.F.R. § 541.202(b).
  - Part of Plaintiff's role was to advise welders on how to repair defective welds

---

[29]   These same facts also satisfy the § 541.202(b) factor of whether Plaintiff had the authority to commit the employer in matters that have significant financial impact. 29 C.F.R. § 541.202(b). The stand Plaintiff took with regard to defective welds committed GIFS to being the cause of additional expense on the project. (DSUMF ¶ 50).

such that they would pass Plaintiff's re-inspection. (DSUMF ¶ 27).

o   Plaintiff also provided his input and interpretation of X-rays and other non-destructive tests, testifying "I would be required from time to time to look at their film and either agree or disagree with what that x-ray technician was calling. Like if he called a weld bad, if he said it was – you know, it was a defect and needed repair, then I would look at his film and either agree with him or disagree. If I disagreed with him, then it would have to go to somebody else, generally a film – or a Level 3 film interpreter." (DSUMF ¶¶ 55).[30]

- Whether Plaintiff had authority to make an independent choice, free from immediate direction or supervision. 29 C.F.R. § 541.202(c).

o   Plaintiff was free to allocate his time and attention as he felt appropriate. (DSUMF ¶ 19). With welding occurring in multiple locations at the same time, Plaintiff was responsible for determining where, when, and how long he should spend on his inspections. (*Id.*) Plaintiff's supervisor rarely told him where to focus his attention. (DSUMF ¶¶ 19, 42).

### 3.   Plaintiff Exercised Discretion with Respect to Matters of Significance Including Safety and Health

Under § 541.202(a), the term "matters of significance" refers to the level of importance or consequence of the work performed. Here, Plaintiff's job was not just critical to ensuring financial success – if he failed to ensure proper welds were performed on a natural gas pipeline, there could be catastrophic consequences. Plaintiff testified:

Q.   Can – can you explain to me, Mr. Sloane, why it's so important to have welding inspectors on a project like at a compressor station?

[Objection]

A.   Why is it so important? Because natural gas is flammable and explosive, and you really want to contain it. You want good quality welds; otherwise, there's that possibility of not containing it and having a fire and explosion and environmental damage.

---

[30]   The fact that an employee's decisions are subject to review does not mean the employee is not exercising discretion and independent judgment. *See* §541.101(c).

Q.      And if any people are around –

A.      Loss of life, yeah. Dangerous to life, health, and environment, yeah.

(DSUMF ¶ 49).

In sum, the undisputed evidence establishes that each element of the administrative exemption applies to Plaintiff. He was paid over $100,000 annualized on a salary basis. He performed non-manual work in inspecting welds. His inspection activities were related to the general business operations (quality control) of GIFS' customer. He exercised discretion and independent judgment in testing welders, interpreting and applying welding procedures to actual conditions in the field, and in recommending ways that welders could repair a weld that Plaintiff had identified as defective. His judgment calls related to welding on a natural gas compressor station were significant – failure to do his job properly could result in serious environmental damage and potential "loss of life." (DSUMF ¶ 49).

## B.      Oil and Gas Pipeline Inspection Is an Exempt Job

Other courts have found that the primary duties associated with oil and gas pipeline inspection are exempt under the FLSA.[31] Two cases are particularly persuasive.

In *Brock v. On Shore Quality Control Specialists*, the Western District of Texas examined the exemption status of oil and gas pipeline inspectors and found them to be exempt under the administrative exemption.[32] The *Brock* court initially noted that there was

---

[31] *See Brock,* 1987 WL 31308, at *4 (holding that pipeline inspectors performed primarily non-manual work and exercised judgment and discretion); Zannikos, 605 F. App'x. 349, 360 (holding that marine superintendents performed non-manual work directly related to the management or general business operations of the oil inspection company's customers); *O'Dell v. Alyeska Pipeline Service Co.*, 856 F.2d 1452, 1453 (9th Cir.1988) (holding that a field inspector was administratively exempt).

[32] 1987 WL 31308, at *7-8.

"no question that the primary duty of all the inspectors at issue consisted of performance of non-manual work directly related to the management policies or general business operations of Defendants . . . and Defendants' Customers." 1987 WL 31308, at *7. Thus, the court focused on "whether or not the performance of that primary duty included work requiring the exercise of discretion and independent judgment." *Id.* In analyzing that issue, the court considered a number of facts, which are also present here:

- In *Brock*, welders who did not pass the inspector's test could not work on the project – the same is true of Plaintiff.[33]

- In *Brock*, the inspectors made "recommendations that employees of the contractors should be dismissed" – Plaintiff also held the power to determine who could and could not weld on his project.[34]

- In *Brock*, the inspectors made "daily decisions as to whether the contractor was … performing the contract in a suitable manner" – so did Plaintiff.[35]

- In *Brock*, inspectors read X-rays "to determine if the weld was proper" – so did Plaintiff.[36]

- In *Brock*, the welding inspector could shut down work "if the weather did not permit good welds to be made" – so could Plaintiff.[37]

- In *Brock*, the specifications against which the inspectors were evaluating the contractors' work gave "the inspectors a considerable degree of discretion in making their judgment that [the specification] has been complied with" – the same is true of the welding procedures applied by Plaintiff.[38]

- In *Brock*, the welding inspectors could "require[] welds that surpass the standards … when they felt a better weld was necessary" – the same is true of Plaintiff.[39]

---

[33] *Compare* 1987 WL 31308 at *7 *with* (DSUMF ¶ 26).
[34] *Compare* 1987 WL 31308 at *7 *with* (DSUMF ¶ 26).
[35] *Compare* 1987 WL 31308 at *7 *with* (DSUMF ¶¶ 3, 16, 17, 28).
[36] *Compare* 1987 WL 31308 at *2 *with* (DSUMF ¶¶ 16, 40)
[37] *Compare* 1987 WL 31308 at *2 *with* (DSUMF ¶ 30).
[38] *Compare* 1987 WL 31308 at *7 *with* (DSUMF ¶ 24).
[39] *Compare* 1987 WL 31308 at *7 *with* (DSUMF ¶ 23).

In short, there is no material difference between *Brock* and the facts of this case.[40]

Plaintiff's duties are also similar to the duties of the exempt field inspectors in *O'Dell v. Alyeska Pipeline Service Co.*[41] In *O'Dell*, the inspector's duties included "observing work and assuring compliance with pertinent regulations and industry standards."[42] Plaintiff also observed work for compliance with welding procedures.[43] In *O'Dell*, the inspector was responsible for "auditing records to ensure compliance with [regulatory] requirements."[44] Plaintiff audited welding paperwork.[45] In *O'Dell*, the "inspectors work[ed] without supervision at remote field locations along the Pipeline."[46] Plaintiff also worked without close supervision. (DSUMF ¶ 42). In *O'Dell*, when work "fails to satisfy minimum standards set out in 'control documents' [the inspector] is to attempt to handle the discrepancy on site by negotiation with the project supervisor."[47] Plaintiff negotiated with the welders to ensure that any defective welds were repaired to Plaintiff's satisfaction. (DSUMF ¶ 16). In *O'Dell*, the inspector "can reject work if it is deemed unacceptable" – so could Plaintiff. (DSUMF ¶ 32).

The undisputed facts in this case align with the facts in both *Brock* and *O'Dell*. Like the pipeline inspectors in those cases, Plaintiff is exempt from the overtime requirements of the FLSA based on his duties as a Welding Inspector.

---

[40] That *Brock* was a decision following a bench trial is immaterial because the foregoing analysis relies solely on the undisputed evidence and Plaintiff's own admissions.

[41] 856 F.2d 1452 (9th Cir. 1988).

[42] 856 F.2d at 1453.

[43] (Pl. Dep. 247:7-248:10)

[44] 856 F.2d at 1453.

[45] (DSUMF ¶ 36).

[46] 856 F.2d at 1453.

[47] *Id.*

### C.   The Undisputed Evidence Establishes that Plaintiff Meets the Highly Compensated Exemption

#### 1.   The Salary Basis Component of the Highly Compensated Exemption Is Satisfied

The salary basis component of the highly compensated exemption requires that an employee receive a total annual compensation of at least $100,000, which includes a weekly salary of at least $455 per week. 29 C.F.R. § 541.601. As set forth above, the undisputed evidence shows that Plaintiff was paid total compensation of $140,504 (annualized), consisting of a fixed salary of $2,702 per week. (DSUMF ¶ 68). Thus, the salary basis component of the highly compensated exemption is satisfied.

#### 2.   The Job Duties Component of the Highly Compensated Exemption Is Satisfied

"Plaintiff is not a minimum wage earner who performed rote tasks in less than ideal conditions." [Doc. No. 192] at 2. Rather, he was a professional pipeline inspector who took home an annualized salary of $140,500. (DSUMF ¶¶ 9, 68). This creates serious doubt that Plaintiff is the kind of employee that the FLSA was designed to protect in the first place.[48] As the Third Circuit noted, the FLSA was meant to protect "rank and file" workers, not employees like Plaintiff, who are paid a six-figure salary and are "seldom the victims of substandard working conditions and low wages."[49]

Given this legislative purpose, "it was logical for the regulations to provide for greater

---

[48]  *See Williams v. Genex Servs., LLC*, 809 F.3d 103, 111 (4th Cir. 2015) (noting that "high salary, over $80,000.00 in the two years preceding this litigation, itself creates doubt as to whether [plaintiff] falls within the FLSA's intended protected class").

[49]  *Marshall v. Western Union Tel. Co.*, 621 F.2d 1246, 1251 (3d Cir. 1980); *see also Darvea v. Detecon, Inc.*, 515 F.3d 334, 338 (4th Cir. 2008) ("Although salary alone is not dispositve under the FLSA . . . the FLSA was meant to protect low paid rank and file employees.").

scrutiny of the day to day duties of lower earning employees in determining their exempt status. Higher earning employees such as the plaintiffs are more likely to be bona fide" exempt employees.[50] As the regulations frame this concept, Plaintiff's "high level of compensation is a strong indicator of [his] exempt status, thus eliminating the need for a detailed analysis of [Plaintiff's] job duties." 29 C.F.R. § 541.601(c).

Accordingly, the duties component of the highly compensated exemption requires only that the employee "customarily and regularly perform[] any one or more of the exempt duties or responsibilities of an executive, administrative, or professional employee." 29 C.F.R. § 541.601(a). "The phrase 'customarily and regularly' means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks." 29 C.F.R. § 541.701.

In other words, GIFS is entitled to summary judgment if Plaintiff "customarily and regularly" performs either of the exempt administrative duties: (a) work related to the general business operations of GIFS' customers or (b) exercising discretion and independent judgment with respect to matters of significance.

A finding as to either element is dispositive; but as shown above, Plaintiff meets both elements.[51] For example, the Southern District of Texas granted summary judgment in an

---

[50] *Counts v. South Carolina Elec. & Gas Co.*, 217 F.3d 453, 456 (4th Cir. 2003); *Escribano v. Travis County*, No. 1:15-cv-331-RP, 2016 WL 8856918, *5 (W.D. Tex. Aug. 25, 2016) ("FLSA's implementing regulations treat certain highly compensated employees as presumptively within the ambit of the statutory exemption for employees 'employed in a bona fide executive, administrative, or professional capacity.'").

[51] *Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 478 (S.D.N.Y. 2008) (highly compensated exemption "removes any requirement that an employer prove that an

FLSA case where it had "no doubt that [plaintiff] customarily and regularly performed work directly related to the management or general business operations" of his employer.[52] The fact that the parties disagreed about discretion and judgment was irrelevant "because the highly compensated employee exemption does not require a finding that [plaintiff] exercise discretion and independent judgment with respect to matters of significance."[53] Indeed, the District of Arizona found it dispositive at summary judgment that the plaintiff customarily and regularly did "quality control" work – like Plaintiff's inspection work – regardless of whether or how much discretion the highly-compensated employee exercised.[54]

Because the administrative exemption applies, the relaxed job duties test that applies to employees (like Plaintiff) earning more than $100,000 per year is also satisfied. As a result, GIFS is entitled to summary judgment on Plaintiff's FLSA claim.

## III.   PLAINTIFF'S PENNSYLVANIA MINIMUM WAGE ACT CLAIM FAILS BECAUSE HE IS EXEMPT FROM THE OVERTIME REQUIREMENTS

The Pennsylvania Minimum Wage Act has an administrative exemption nearly identical to the FLSA's administrative exemption, and courts often analyze exemption issues under both the FLSA and PMWA simultaneously.[55] Accordingly, GIFS is entitled to

---

administrative employee exercised discretion in the performance of her duties"); *Coppage v. Bradshaw*, 665 F. Supp. 2d 1361, 1369 (N.D. Ga. 2009) (highly compensated exemption does not require proof of discretion and independent judgment).

[52]  *See Karna v. BP Corp. N.A.,* No. H-12-0101, 2013 WL 1155485, *19 (S.D. Tex. 3/19/13).

[53]  *Id.*

[54]  *Mamola v. Group Mfg. Servs., Inc.*, No. CV-08-1687-PHX-GMS, 2010 WL 1433491, *12 (D. Ariz. Apr. 9, 2010) (granting summary judgment where employer showed that highly-compensated employee customarily and regularly did "quality control" work, even absent proof of discretion and independent judgment)

[55]  34 Pa. Code § 231.83; *see also Baum v. AstraZeneca LP*, 372 F. App'x 246, 248-49 (3d

summary judgment on Plaintiff's PMWA claim for the same reason that summary judgment should be entered on his FLSA claim – he was an exempt administrative employee.[56]

## IV.   PLAINTIFF'S UNJUST ENRICHMENT CLAIM FAILS BECAUSE IT IS DERIVATIVE OF OVERTIME CLAIMS THAT HAVE FAILED

Plaintiff's final claim is for unjust enrichment, based on the theory that GIFS was unjustly enriched by receiving labor from Plaintiff for more than 40 hours in a workweek without paying him overtime above and beyond his $140,000 per year salary. [Doc. No. 1]. To state a claim for unjust enrichment, Plaintiff must show: (1) benefits conferred on GIFS by Plaintiff; (2) appreciation of the benefits by GIFS; and (3) GIFS' acceptance and retention of the benefits under the circumstances would be inequitable.[57]  "A claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that . . . would be unconscionable for her to retain."[58]

As a matter of logic, there can be no unjust enrichment without an obligation to pay overtime in the first place.[59] Because Plaintiff was not owed any overtime because he was

---

Cir. 2010) (analyzing PMWA administrative exemption using FLSA regulations); *Messmer v. Colors in Bloom, Inc.*, 67 F. App'x 719, 721 n.1 (3d Cir. 2003) (affirming summary judgment on PMWA claim while discussing only FLSA regulations); *Jochim v. Jean Madeline Educ. Ctr. of Cosmetology, Inc.*, 98 F. Supp. 3d 750, 756 (E.D. Pa. 2015) ("The Pennsylvania Minimum Wage Act mirrors the FLSA. Based on the 'identity of purpose' between those two statutes, Pennsylvania courts employ the same tests used by the federal courts and use federal case law to determine the governing standard.").

[56]  *See Paul v. UPMC Health Sys.*, No. 06-1565, 2009 WL 699943, *8 n.1 (W.D. Pa. Mar. 10, 2009) ("The exemptions under both the FLSA and PMWA are identical. . . . The decision with respect to plaintiff's FLSA claim is therefore dispositive of plaintiff's PMWA claim.").

[57]  *Wilson Area Sch. Dist. v. Skepton*, 860 A.2d 625 (Pa. Cmwlth. 2004).

[58]  *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 273 (3d Cir. 2010).

[59]  *See Strunk v. City of Altoona*, 166 Pa. Super 608, 612 (1950) (rejecting claim for unjust enrichment where plaintiffs were not entitled to overtime); *see also Juarez v. Autozone Stores, Inc.*, No. 08cv00417-CAB(BLM), 2012 WL 12846087, *10 (S.D. Cal. Sept. 28, 2012)

exempt from both the FLSA and PMWA as a matter of law, he did not confer any benefit on GIFS for which GIFS did not fully pay the promised amount. In fact, Plaintiff was paid even when he did not work. Thus, Plaintiff's unjust enrichment claim should also be dismissed.

## CONCLUSION

Proving the adage that "no good deed goes unpunished," GIFS hired a convicted felon for a job that paid him over $140,000 per year and involved no manual labor. Rather than be thankful for employment given his numerous criminal convictions, let alone a six-figure income, Plaintiff repaid GIFS by launching a frivolous nationwide overtime lawsuit that has caused GIFS to spending hundreds of thousands of dollars to defend. Once again, Plaintiff is "playing the system" as he surely is not the kind of low-wage employee the FLSA and PMWA were designed to protect. The evidence in this case overwhelmingly proves that Plaintiff was guaranteed a six-figure salary and exercised discretion and independent judgment in advising welders as to the quality and safety of the welds. He was properly classified as exempt under both the administrative and the highly compensated exemptions. GIFS respectfully requests that this Court grant summary judgment and dismiss all claims asserted by Plaintiff.

Respectfully submitted this 18th day of July, 2017.

/s/ *Annette A. Idalski*
Annette A. Idalski, Esquire
Admitted *pro hac vice*
Peter N. Hall, Esquire
Admitted *pro hac vice*
CHAMBERLAIN, HRDLICKA, WHITE,

---

(summary judgment granted on unjust enrichment claim because claim was "derivative of . . . causes of action for failure to pay overtime wages")

WILLIAMS & AUGHTRY
191 Peachtree Street, NE
46th Floor
Atlanta, Georgia 30303
(404) 658-5386
Annette.idalski@chamberlainlaw.com
Peter.hall@chamberlainlaw.com

Veronica Saltz Turner, Esquire
Attorney ID No.: 52931
CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & AUGHTRY
300 Conshohocken State Road
Suite 570
West Conshohocken, PA 19428
(610) 772-2330
vsaltz@chamberlainlaw.com

*Attorneys for Gulf Interstate Field Services, Inc.*

## CERTIFICATE OF SERVICE

I do hereby certify that this date, I caused a true and correct copy of the foregoing **Defendant's Brief in Support of Motion for Summary Judgment** to be filed via the Official Court Electronic Document Filing System, and that said document is therefore available for viewing and downloading from the ECF system. By virtue of this filing, service upon the following counsel, being Electronic Case Filing Users, is complete upon counsel's receipt of the Court's e-mail notification of the Notice of Electronic Filing. Those counsel and/or parties who have not yet entered an appearance will be served via first class mail, addressed as follows:

Shanon J. Carson
Sarah R. Schalman-Bergen
Alexandra K. Piazza
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103

Richard J. (Rex) Burch
James A Jones
BRUCKNER BURCH PLLC
8 Greenway Plaza, Suite 1500
Houston, Texas 77046

Respectfully submitted this 18th day of July, 2017.

/s/ Annette A. Idalski
Annette A. Idalski, Esquire